UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  02-20245-cv-HUCK/O'SULLIVAN

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, et al.,

        Plaintiffs,

v.

SLAVIK STEIN, et al.,

        Defendants.

_____/

**MEMORANDUM IN SUPPORT OF
RESPONDENTS' MOTION [DE 27] TO
DISSOLVE TEMPORARY RESTRAINING ORDER [DE 13]**

**COME NOW** JACOB/YAKOV GITMAN ("Gitman"), AGRO-ENERGY HOLDINGS,
LLC, AGRO-ENERGY HOLDINGS INTERNATIONAL, INC., and AGRO-ENERGY USA
INC. (collectively, the "Agro Entities"; collectively with Gitman, "Respondents"), by and
through undersigned counsel, and file this Memorandum in support of their Motion [DE 27] to
Dissolve the Temporary Restraining Order entered by this Court on November 5, 2010 [DE 13].

**Summary of Argument**

At an ex-parte hearing on November 5, 2010, Plaintiffs managed to obtain a Temporary
Restraining Order ("TRO") [DE 13] enjoining Gitman and the Agro Entities from a number of
things, and authorizing a "Forensic Custodian" to enter Respondents' offices and conduct the
"imaging" and "inventory" of "any and all computer-related devices," "all business documents"
and "all tangible things" located there.  TRO ¶ 2, at 3-4.

However, Plaintiffs proceeded under the wrong rule (Rule 65) of the Federal Rules of
Civil Procedure as the basis for their motion.   Plaintiffs, who seek to "enforce its Judgment"
obtained from a Texas federal court, are constrained to proceed under Rule 69, Fed. R. Civ. P.,
which expressly mandates application of "the practice and procedure of the state in which the

district court is held." Rule 69(a), Fed. R. Civ. P.  Controlling authority from the Eleventh Circuit Court of Appeals and Florida state courts uniformly, unequivocally and expressly holds that a TRO is not authorized under the circumstances presented by plaintiffs to this Court.

Gitman is not a debtor to plaintiffs, nor a named defendant in this heavy-handed collection effort by plaintiffs.  No claim against Gitman has ever been filed with this Court.  No pleadings in Proceedings Supplementary have been filed by Plaintiffs, nor any pleadings seeking attachment, impleader or garnishment, all of which are readily available under Florida law.  Only a Judgment from the United States District Court for the Southern District of Texas against one Michael Giventer (and others) was filed on January 24, 2002 [DE 1], and registered in this district pursuant to 28 U.S.C. § 1963 [DE 2].  The case was then "closed" and remained dormant for almost nine years.

Even if a TRO could possibly be authorized, a careful examination of plaintiffs' motion and affidavit shows that they do not meet the four-part test required to have a TRO or injunction issue.  Indeed, plaintiffs' motion and affidavit are replete with mischaracterizations of Gitman's testimony, conjecture, suppositions and, astonishingly, impermissible racial profiling:

> "Gitman and Giventer are both Russian immigrants. The Russian community in South Florida is very tightly knit and historically, even new friends or acquaintances will go to great lengths in order to assist another, even if it means committing perjury."

Mot. at 13.

Finally, although plaintiffs counsel persuaded this Court that their need for this extraordinary remedy was absolutely necessary, plaintiffs' expressed need for an *ex-parte* hearing to obtain this illegal, improper TRO is belied by its own counsel's previous actions.

The TRO should immediately be dismissed.

- 2 -

## ARGUMENT

**Although Plaintiffs Purported to Bring
Their Motion Pursuant to Rule 65(b)(1), Fed. R. Civ. P.,
Rule 69 Actually Governs the Process for the Enforcement of Money Judgments**

Plaintiffs' Verified Ex Parte Combined Motion and Supporting Memorandum for a Temporary Restraining Order and for Appointment of a Receiver ("Mot.") [DE 3] starts off with the assertion that:

> "Michael Giventer ("Giventer") owes $8.6 million (plus millions of dollars in interest, attorneys fees and costs) to Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm County Mutual Insurance Company of Texas (together, "State Farm") based upon a judgment from the District Court for the Southern District of Texas in 2001 (the "*Judgment*") . . . . Having pursued him for several years, State Farm has now recently discovered new information and **is moving again to enforce its Judgment.**"

Mot., "Introduction" at 1 (emphasis added).

Plaintiffs go on to allege that they are seeking:

> "relief *ex parte*, pursuant to Fed. R. Civ. P. 65(b)(1), in light of Giventer's extensive history (discussed herein) of hiding and dissipating assets, as well as of destroying evidence of those assets. (*See* Affidavit of Neal H. Levin, attached hereto as Exhibit A, which affidavit certifies, *inter alia*, the reasons why notice to the adverse parties should not be required.)"

> *Id.*

However, the "relief" that plaintiffs are seeking ("to enforce its Judgment") requires application of Rule 69, Fed. R. Civ. P., *not* Rule 65.  Rule 69 provides:

> Rule 69. Execution

> (a) In General.
> (1) Money Judgment; Applicable Procedure.

> "A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution — and in proceedings supplementary to and in aid of judgment or execution — must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."

JAROSLAWICZ LAW OFFICES
1177 Kane Concourse #222 ● Bay Harbor Islands, Florida 33154 ● T 305.398.7739 ● F 786.206.3575 www.MyLawyerIsaac.com

There is no question that Federal Rule of Civil Procedure 69 governs the process for the enforcement of money judgments.  *See, e.g., Papadopoulos v. Sidi*, 547 F. Supp.2d 1262 (S.D. Fla. 2008).

Rule 69 directs that proceedings in aid of execution of a judgment shall be in accordance with the practice and procedure of the state in which the district court is held.  Rule 69 thus sets out a path upon which judgment creditors must proceed to execute on judgments, and plaintiffs have cited no authority that it or this Court may stray from that path.  Put differently, plaintiffs have provided no authority that this Court has the inherent power to issue injunctions to aid a judgment creditor in collection, independent of the "practice and procedure of the state in which the district court is held."  *Papadopoulis,* 547 F. Supp. 2d at 1266.

Non-statutory remedies to aid a judgment creditor in execution of its judgment are simply not authorized and therefore, not permissible and not lawful. *Id.* at 1266-67 (citing, *inter alia, ITT Cmty Dev. Corp. v. Barton*, 569 F.2d 1351 (5th Cir. 1978) (district court improperly enjoined a third party to deposit funds into the registry of the court); *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1525-30 (11th Cir. 1994) (district court improperly issued a preliminary injunction under rule 64 barring the defendant from transferring or liquidating certain assets in order to protect the plaintiff's ability to collect on a money judgment, if one was later entered in plaintiff's favor).

While many of the cases analyzing these situations are pre-judgment cases, the Court in *Papadopoulos* recognized that, just as there is a statutory scheme for pre-judgment attachment that cannot be circumvented, there is a comprehensive post-judgment statutory body of law that a judgment creditor cannot by-pass.[1]  The *Papadopoulos* Court further concluded that, just as

---

[1]  While the Plaintiffs here may be in post-judgment mode with respect to the actual judgment debtor, Giventer, Respondent Gitman submits that, as to him and the Agro entities, even pre-judgment standards would apply (since there has been no finding as to him or his assets based upon any trial or evidentiary fact-finding).

- 4 -

Rule 64 requires application of the state law to pre-judgment proceedings, Rule 69 requires the same deference in post-judgment proceedings.  547 F. Supp.2d at 1267.[2]

### The Proper Procedure Under Florida Law Is Proceedings Supplementary With a Motion for Impleader of Third Parties, Which Procedure Does Not Provide for a TRO Against a Third Party In Whose Hands the Property May Be

Decisions of the Eleventh Circuit Court of Appeals reflect and demonstrate the proper procedure pursuant to Florida law to obtain property from the hands of a third-party.[3]  For example, in *Mission Bay Campland v. Sumner Financial Corp.*, 731 F.2d 768 (11th Cir. 1984), a plaintiff sought to enforce a judgment; it brought proceedings supplementary seeking to implead third parties – a parent and wholly-owned subsidiary – in order to challenge transfer of assets as fraudulent.  In yet another case in this district, *Bally Case & Cooler v. H. Kaiser Associates*, 514 F. Supp. 352 (S.D. Fla., 1981), the district court, faced with very similar facts to those in our case, denied a restraining order and clearly expressed why:

> On January 29, 1981 plaintiff filed a Motion for Temporary Restraining Order seeking to enjoin non-parties from disposing of property previously owned by the judgment debtor. In its supporting affidavit the plaintiff asserted that the subject airplane had been transferred from the defendant to Steven Silver and Nan Silver who thereafter transferred it to Big Green Frog Enterprises. These transfers occurred in October, 1979 — nine months before the institution of the instant suit. This court denied that application for injunctive relief on the ground, inter alia,

---

[2] The cases cited by plaintiffs are easily distinguishable.  *Fairview Machine & Tool Co. v. Oakbrook Intern.*, 77 F.Supp.2d 199 (D. Mass., 1999) the court noted that plaintiffs had an equitable interest in defendant's assets. Here, they are not claiming a right to a specific asset; they are just trying to satisfy a judgment against another person. In *Feit and Drexler v. Drexler*, **760 F.2d 406 (2d Cir. 1985),** the context was also different. The case was in bankruptcy and it involved  assets transferred to name of the debtor herself- not held by a third party and not as part of execution of a judgment by an individual judgment creditor.

[3] *In Liberty Mutual Ins. Co. v. C-Staff Inc.*, 318 F.3d 1052 (11th Cir.  2003), the 11th Circuit reversed its previous decision in the same case reported at 280 F.3d 1337 (11th cir 2002). In the initial case, the appellate court was not sure whether impleader was appropriate under Georgia law. Upon certification to it, the Georgia Supreme Court ruled that Georgia does not have such a procedure as proceedings supplementary with impleader for third parties. Accordingly, the 11th Circuit felt constrained under Rule 69, Fed. R. Civ. P. to reverse its previous decision.

JAROSLAWICZ LAW OFFICES
1177 Kane Concourse #222 ● Bay Harbor Islands, Florida 33154 ● T 305.398.7739 ● F 786.206.3575 www.MyLawyerIsaac.com

that neither the Silvers nor Big Green Frog Enterprises had ever been served with any pleadings nor were they parties to the original action.

The correct procedure to be followed in the instant case is set forth in Fla. Stat. § 56.29 which contains two jurisdictional prerequisites for supplementary postjudgment proceedings. First, the judgment creditor must present a returned and unsatisfied writ of execution. Second, the judgment creditor must present an affidavit averring that the writ of execution is valid and unsatisfied, as well as listing third parties who are to be impled.  *Mission Bay Campland, Inc. v. Sumner Financial Corp.*, 71 F.R.D. 432, 434 (M.D. Fla.1976); *Tomayko v. Thomas*, 143 So. 2d 227, 229-30 (Fla. 3d DCA 1962).

*Bally Case & Cooler*, 514 F. Supp. at 354-55.[4]  The Court noted that the, "duty to implead third parties whose interests may be affected by the court's rulings enables the court to acquire jurisdiction over them and affords them the essential elements of procedural due process of law."  *Id.* (citing *Mission Bay Campland*, 71 F.R.D. at 434).  Once the court acquires jurisdiction over such non-parties, they may be ordered "to show cause why the assets now in their possession or control, allegedly transferred to them by plaintiff, should not be declared fraudulently acquired, the transfers voided, and those assets levied upon to satisfy defendant's judgment."  *Mission Bay Campland*, 71 F.R.D. at 435.

There is no question that Fla. Stat. § 56.29 is the correct procedure to be followed in execution of judgment where the property sought to be levied on is (a) in the possession or control of a third party; and (b) is titled in the name of a third party. *Bally Case & Cooler*, 514 F. Supp. at 354-355; *see also Allied Indus. Int'l v. AGFA-Gevaert, Inc.*, 688 F. Supp. 1516 (S.D. Fla. 1988) (procedure).

The Eleventh Circuit Court of Appeals long ago reiterated the appropriate procedure:

After securing a judgment on a promissory note from MBC, SFC brought supplementary proceedings seeking to implead appellants, Peninsular Life Insurance Company (Peninsular) and its wholly-owned subsidiary, Penn

---

[4] The actual procedure to acquire jurisdiction with supplementary proceedings pursuant to § 56.29, Fla. Stat., has changed since the *Bally Case* decision.  *See, e.g., Standard Prop. Inv. Trust v. Luskin,* 585 So. 2d 1099 (Fla. 4th DCA 1991).  Nevertheless, the underlying principles apply.

JAROSLAWICZ LAW OFFICES
1177 Kane Concourse #222 ● Bay Harbor Islands, Florida 33154 ● T 305.398.7739 ● F 786.206.3575 www.MyLawyerIsaac.com

Enterprises, Inc. (Penn), in order to challenge appellants' foreclosure and transfer of MBC's assets as a fraudulent conveyance. The district court implead appellants and on March 31, 1982, adopted the special master's recommended holding that the foreclosure and transfer were fraudulent and that proceeds from the sale of MBC's assets transferred from Peninsular to Penn be traced and treated as property of MBC upon which SFC may execute its judgment.

*Mission Bay Campland, Inc. v. Sumner Fin. Corp.*, 731 F.2d 768 (11th Cir. 1984).

Florida courts are extremely clear as to the appropriate procedure, and why it is so critically important:

The authority and duty of a court to implead third parties is clear. *Richard v. McNair*, *supra*, <u>164 So. at 840</u>. Impleading those parties whose interest may be affected by the court's rulings is necessary both to acquire jurisdiction over them and to afford them procedural due process. … Such impleading, however, does not in of itself imply liability on the part of the impleaded third parties. It provides them with an opportunity to raise their defenses and protect their interests consistent with genuine due process. The fundamentals of procedural due process are (1) a hearing (2) before an impartial decision-maker, after (3) fair notice of the charges and allegations, (4) with an opportunity to present one's own case.

*Wieczoreck v. H & H Builders, Inc.*, 450 So. 2d 867 (Fla. 5th DCA 1984) (citations omitted).

In *Rosen v. Cascade International, Inc.*, 21 F.3d 1520 (11th Cir. 1994), the Eleventh Circuit made it clear that district courts had no power under Rule 65 to issue a preliminary injunction that amounts to a prejudgment attachment when the underlying action seeks only monetary damages and no statute specifically authorizes ancillary prejudgment relief. *Rosen,* 21 F.3d 1529. There is simply no authority to restrain the use of even a debtor's assets prior to findings. Where a plaintiff failed to use Florida pre-trial procedures for attachment, the court reversed attachment.

The appellees do not attempt to invoke, and the district court did not at any time address, Florida attachment law. In actions at law, plaintiffs in Florida possess an adequate, exclusive prejudgment remedy for the sequestration of assets under the attachment statute, Fla. Stat. Ann. Sec. 76.04-.05 (West 1987), provided that they can satisfy the enumerated statutory grounds for relief. Accordingly, the use of injunctive relief as a substitute for the remedy of prejudgment attachment, with its attendant safeguards, is improper.

JAROSLAWICZ LAW OFFICES
1177 Kane Concourse #222 ● Bay Harbor Islands, Florida 33154 ● T 305.398.7739 ● F 786.206.3575 www.MyLawyerIsaac.com

Id., at 1531 (citing *Action Elec. & Repair, Inc. v. Batelli*, 416 So. 2d 888 (Fla. 4th DCA 1982)); *Acquafredda v. Messina*, 408 So. 2d 828 (Fla. 5th DCA 1982).

Here, the restraint of a non-defendant's use of his property is improper absent a factual determination finding that it is really a **defendants'** property.  Just as the court cannot issue a pre-judgment injunction as to a defendant, Gitman here is in the position of a defendant before an adjudication of plaintiffs' entitlement to the property. The rule in Florida is that a court "is without jurisdiction to issue an injunction which would interfere with the rights of those who are not parties to the action. An injunction can lie only when its scope is limited in effect to the rights of parties before the court." *Sheoah Highlands, Inc. v. Daugherty*, 837 So. 2d 579 (Fla. 5th DCA 2003) (citing *Street v. Sugerman*, 177 So. 2d 526 (Fla. 3rd DCA 1965) (holding that the court was without jurisdiction to issue an injunction in a common law action, interfering with the assets of a corporation and the rights of third-party stockholders who are not parties to the action.)).[5] *See also South Dade Farms, Inc. v. Peters,* 88 So. 2d 891 (Fla. 1956); *Alger v. Peters*, 88 So. 2d 903 (Fla. 1956); *Fontainebleau Hotel Corp. v. City of Miami Beach*, 172 So. 2d 255 (Fla. 3rd DCA 1965).[6]

---

[5] As the Court noted:

> Even though proceedings supplemental to execution may have been commenced, it does not appear that there is any statutory authority for a trial judge in a common law action to issue an injunction of the nature involved herein. We have examined the provisions of Ch. 55, Fla. Stat., and particularly § 55.60, Fla. Stat., F.S.A. relative to supplemental proceedings and it appears that, although the trial judge would have the authority to 'subject any property or property rights of any defendant to the satisfaction of any execution against him', this was not the purported purpose of the order in the instant case.

177 So. 2d at 528 (Fla. 3d DCA 1965).

[6] Respondents do not contend that a temporary injunction is *never* appropriate in order to aid and protect a judgment creditor. The Third District Court of Appeals did uphold a temporary injunction in *17315 Collins Avenue, LLC v. Fortune Development Sales Corp.*, No. 3D09-2056 (Fla. 3rd DCA 2010). In that case, however, the injunction related to a parent/subsidiary situation, and there was already a finding of improper use of corporate entity. The Court specifically noted that it was appropriate because of the procedures that had been followed pursuant to proceedings supplementary and the plaintiff had proven that it was appropriate to pierce the corporate veil.

- 8 -

Inasmuch as case law in this jurisdiction supports Respondents' position that Rule 69 applies and does not allow for any injunctive relief under the circumstances herein, Respondents respectfully submit that this Court must dissolve the TRO, *nunc pro tunc*.

**Plaintiffs Should Not Have Obtained
a Temporary Restraining Order Because They Cannot Establish
Their Right to Permanent Injunctive Relief In Aid of Execution On Their Judgment**

Plaintiffs brought this motion for a TRO pursuant to Fed. R. Civ. Pro. 65, which governs temporary restraining orders as a subset of injunctive relief.  In other words, if the plaintiffs would not eventually be entitled to an injunction, they are not entitled to a preliminary injunction nor a TRO.  *See Noventa Ocho LLC v. PBD Props. LLC*, No. 08-10035 (11th Cir. July 3, 2008) (no injunctive relief where plaintiff seeks only damages).  In our case, as was also recognized by the court in *Papadopoulis*, "Plaintiff's motion for a permanent injunction fails for other reasons that go to the heart of the nature of injunctive relief." 547 F. Supp.2d at 1268.

First, injunctions are inherently equitable in nature and "equitable relief is available only in the absence of an adequate remedy at law." *Papadopoulis*, 547 F. Supp.2d at 1268 (citing *SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A.*, 243 Fed. Appx. 502, 503 (11th Cir. 2007)); *see also Mitsubishi Int'l Corp. v. Cardinal Textiles Sales, Inc.* 14 F.3d at 1507 (11th Cir. 1994) (stating this principle in the context of constructive trusts).  Here, as in *Papadopoulis*,

> Plaintiff has available to it here numerous more-than-adequate remedies at law to collect on its judgment, and each of those remedies fall under the umbrella of Rule 69(a)…The fact that Plaintiff has not successfully collected the full judgment does not mean that Plaintiff has no remedy at law.

547 F. Supp.2d at 1268-69.  The Court then quoted the Eleventh Circuit Court of Appeals' overview of the court's power to enter an injunction, and that "[t]here is no such thing as a suit for a traditional injunction in the abstract":

> First, any motion or suit for either a preliminary or permanent injunction must be based upon a cause of action, such as a constitutional violation, a trespass, or a nuisance. There is no such thing as a suit for a traditional injunction in the abstract.... An injunction is a remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed — if the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise. However, because it is an extraordinary remedy, it is available not

- 9 -

simply when the legal right asserted has been infringed, but only when that legal right has been infringed by an injury for which there is no adequate legal remedy and which will result in irreparable injury if the injunction does not issue.

*Alabama v. United States Army Corps of Eng'rs*, 424 F.3d 1117, 1127-28 (11th Cir. 2005) (internal quotation marks and citations omitted), *cert. denied* 547 U.S. 1192 (2006).

Here, plaintiffs have not and cannot show that, by having an unsatisfied judgment, they have had any rights infringed, ***and most certainly not by Mr. Gitman.***

### Plaintiffs Have Not and Cannot
### Meet the Preliminary Injunction Standard

A preliminary injunction is "an extraordinary and drastic remedy" that should be granted only if the moving party has clearly established four elements: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *see also Winter v. Natural Res. Def. Council, Inc*., 555 U.S. _____, 129 S. Ct 365 (2008).

### Plaintiffs Have Not and Cannot Demonstrate
### a "Substantial Likelihood of Success On the Merits"

Plaintiffs have argued that they are likely to succeed on the merits *because they have a judgment against Giventer*.  Mot. at 17 ("the movant has already succeeded on the merits. The District Court in Southern Texas awarded State Farm a substantial judgment, which State Farm is now attempting to enforce").  However, plaintiffs have not and cannot show that they are likely to succeed in their claim that *Mr. Gitman* and entities owned by him are somehow indebted to them.  *Those* are the merits at stake.

Plaintiffs' Motion for TRO/Injunction fails to meet the necessary threshold of substantially succeeding on the "merits" because:

1.    Plaintiffs' motion primarily asserts facts about *Giventer*, not Gitman;
2.    There are no *facts* asserted whatsoever that Giventer "really" owns or controls Agro, only speculation and suppositions;

- 10 -

3.     Plaintiffs claim at best that they "believe" they would suffer harm, which is not a sufficient showing;

4.     Gitman's deposition transcript, attached as Exhibit "U" to plaintiffs' motion, clearly reflects that he was forthcoming and not likely to hide or destroy anything;

5.     Plaintiffs' allegations are so weak that plaintiffs ultimately must resort to impermissible racial profiling, based upon nationality and immigrant status;

6.     Plaintiffs' counsel's own actions – months ago -- belies plaintiffs' claims to this Court that there was an urgency or threat to require an *ex parte* hearing.

## The Motion and Accompanying Affidavit (Ex. "A") [DE 3-1]
## Failed to Fairly Advise This Court of Gitman's Previous Conduct

At the outset, it would appear that, when a party brings an *ex parte* motion to the court, the very least to be expected is that they present the evidence fairly – and not simply slant facts or take statements out of context. Further, it should be obvious that such party has a duty to present the court with all relevant facts – not just those that support their application, inasmuch as the other side cannot be heard.

## Plaintiffs Failed to Make and Cannot Make the
## Required Showing of Imminent and Irreparable Harm

As the Supreme Court stressed in *Winter*, "[t]he applicant must demonstrate that in the absence of a preliminary injunction, 'the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered,'" 129 S. Ct at 375 (citations omitted). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Id.* at 376 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

Plaintiffs here have neither shown that the harm is likely or that it is irreparable harm, as that term is used in the context of injunctions.

Irreparable injury must be neither remote nor speculative, but actual and imminent. Moreover, if any injury can be undone through monetary remedies, it is not irreparable. The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of

- 11 -

litigation, weighs heavily against a claim of irreparable harm.... Prospective harm, by itself, clearly does not meet the test of imminence.

*Papadopoulis,* 547 F. Supp.2d at 1269 (citing *SME Racks, Inc.*, 243 Fed. Appx. at 504 (internal citations and quotation marks omitted)).  The Court recognized, too, in a footnote, that even if there is a possibility that plaintiff never collects its money, there would be no "irreparable harm." *Id.* at 1269 n. 12.  "That sort of statement can be made by virtually every person who sues another for money damages. Its very ubiquity indicates why it cannot conceivably be enough to justify the issuance of a prejudgment injunction of this nature." *Charlesbank Equity Fund II v. Blinds To Go, Inc*., 370 F.3d 151, 163 (1st Cir. 2004).  The difficulty plaintiffs are experiencing does not empower this Court, under these circumstances, to grant them the relief they seek here.

In the first instance, Plaintiffs cannot meet the test because they seek the very same relief that the court in *Papadopoulis* stated is not – as a matter of law -- irreparable harm.  Plaintiffs here supposedly seek to maintain the "status quo" in order to preserve assets from which to collect a judgment.

Also, on the facts, Plaintiffs fail to show a likelihood of irreparable harm. Plaintiffs did not supply this Court with any facts - as distinguished from theories - from which anyone could reasonably conclude that they would be "likely to suffer irreparable harm**"** in the absence of a TRO or preliminary injunction.  Both the Motion for the TRO and the affidavit of Neal Levin in support of the motion give many facts concerning as to behavior by *Giventer* and his current and former wives. The affidavit recites 24 paragraphs of allegations about *Giventer*.  Nowhere is there any evidence concerning the Agro enties or any other entity with which Mr. Gitman is involved.   Only in paragraph 25 does Levin assert, based upon how "familiar" he claims to be about "how *Giventer* operates," does he baldly assert that the Agro entities and MetaTech (a company in which Gitman's *son* is involved), "appear to be a new web of business entities utilized by Giventer to hide and shield assets."

A review of any of the cases cited in this area of law demonstrates that in each case the Court had before it facts that proved that the party to be restrained had actually engaged in

- 12 -

wrongdoing.[7] The allegations "sworn" to by Mr. Levin, that the business of Agro and MetaTech "appear to be a new web" is simply not sufficient under the standard as articulated by the Supreme Court – that Plaintiff is *likely* to suffer irreparable harm. In fact, paragraph 30 of Levin's affidavit asserts that State Farm fears that advance notice of the proceedings "could jeopardize State Farm's ability to preserve the status quo," language which, on its face, does not meet the standard required by law.

In paragraphs 26-27 of his affidavit, Mr. Levin goes on to describe connections between various family members and business associates.  Again, none of these allegations asserts anything that Gitman has done wrong.  In paragraph 28, Levin must rely on outright hearsay -- nothing based upon his own knowledge -- concerning statements purportedly made by one Bob Miller that, "he only did business relating to Agro with Michael Blanc a/k/a Giventer and only dealt with Oleg once."  Should an evidentiary hearing ultimately be required, Mr. Gitman will present to this Court *numerous* e-mails between himself and Miller, some of which he recalls were copied to Levin, too!

In his final paragraphs, Mr. Levin "testifies" that he "*believes*" Giventer will destroy evidence. However, his belief does not rise to a showing that it is likely that such harm will occur, and it says nothing about *Gitman* destroying evidence. The fact that all parties appear to believe that Giventer is not even in the United States[8] and has no access to any assets or documents, further underscores the absurdity of this supposed "threat."

---

[7] Even the case cited by Plaintiffs, *Feit and Drexler v. Drexler*, 760 F.2d 406 (2nd Cir. 1985), involved a bankruptcy debtor who was shown to have transferred assets to herself and lied about it; in this case there is not one iota of evidence that Mr. Gitman has lied or committed any other improper act. *See, e.g.*, *Newby v. Enron Corp.*, 188 F. Supp.2d 684 (S.D. Tex. 2002), and the cases referred to therein).

[8] That was the representation of plaintiffs' counsel at the hearing on Nov. 15, 2010, and is referenced throughout the pleadings, that Giventer is supposedly in the Ukraine trying to raise money or business for Agro. (Tr. 11/15/10: 003-23)

- 13 -

**<u>There Are No Credible Facts That Demonstrates Giventer Owns or Controls Agro</u>**

There is nothing in plaintiffs' affidavit or the attached deposition of Mr. Gitman that supports Mr. Levin's suspicion (and maybe, wishful thinking) that Agro really belongs to Giventer.  The only supposed fact consists of a hearsay allegation that Bob Miller told Levin that he dealt with Giventer.  Levin Aff., Mot. Ex. "A" ¶ 28; Mot. at 15.  Mr. Levin extrapolates from Giventer's *previous use of his former and current wives* that Giventer has so much influence and power over others that he has somehow managed to convince a legitimate businessman, who happens to do business with Giventer's father-in-law, to risk his business and reputation in order to help Giventer. Mot. at 8-10. This attenuated supposition cannot be a sufficient basis for the restraint of Mr. Gitman's assets.

<b>Plaintiffs' Motion Wholly Mischaracterizes Gitman's Testimony;<br><u>That Testimony Is Unassailed, Except Perhaps by Levin's Incredulity</u></b>

Plaintiffs' motion, on pages 10 and 11, asserts that Giventer has involved his father-in-law, Oleg, and business associate, Gitman, as his "straw people."  The motion then outlines all the connections between the Agro entities and *Gitman*.  Plaintiffs allege that, "Agro's background is similar to the prior web of companies that involved Ms. Shvabskaya."  How they are similar is unclear, other than the fact that – like many U.S. corporate entities - there are relationships and connections.

Accordingly, plaintiffs attempt to paint Mr. Gitman as just another person lying and prevcaricating to supposedly protect Giventer.  However, a careful reading of the exhibits attached to plaintiffs' motion demonstrate that, in fact, it is plaintiffs who are playing games.

Plaintiffs' counsel failed to inform the court that Gitman showed up for his deposition almost a year ago, in December, 2009, apparently upon notice from his attorney that he had been served (or that Agro had been served). Gitman showed up without counsel, and, as the deposition transcript reflects, answered almost all questions fully and cooperatively. He even volunteered information, such as the amount of money in and out of Agro Holding. Ex. U, at 71:4-20, and how to obtain deleted emails from his internet provider.  *Id.*  at 79:14-25 & 81:15-19.  Gitman gave plaintiffs the documents they wanted, except for those that he had been advised by his own corporate attorneys not to give without a court order. *Id.*  at 71:4-20.  Gitman provided

- 14 -

information as to the number of Agro bank accounts, the banks in which deposits were made, and whose funds had been deposited.  *Id.*  Gitman resisted providing only the bank statements themselves, which he explained counsel told him not to provide without a court order. Even then, he essentially volunteered: "well, I think you should get a court order and then I can give it to you." *Id.*  He said the same as to the cell phone number of Giventer that counsel was demanding. *Id.*  at 14:9-15:25.  Even then, he was willing to let Mr. Levin know whether the number *he* already had was correct.  *Id.*  at 95:13–96:5.  Although plaintiffs' motion claims that Gitman refused to disclose where Giventer resided, Mot. at 14, the truth as revealed in plaintiffs' own exhibit is that Mr. Gitman testified that he did not know where Giventer lived at the time of questioning.  *Id.* at 16:12-14 & 15:15-16.

**<u>Both Oleg and Gitman are Excellent Scientists - Even If They Don't Speak English</u>**

Mr. Levin tries to convince this Court that Oleg is somehow not capable of the business he is involved in: Oleg doesn't speak English, and Mr. Levin quotes Mr. Gitman as saying, "Oleg is not ambitious or a businessman." Mot. at 11. That testimony, however, was also taken out of context.  Plaintiffs omit the testimony that Gitman gave that, when he "met with Oleg, he told me about his work in alternative fuel arena."  Ex. U, at 25: 1-2.  Plaintiffs take the comments regarding Oleg's lack of business acumen out of context; specifically, that it was simply by way of explanation as to why Gitman became the operating manager of Agro. Ex. U, at 40:11-23. Plaintiffs ignore Gitman's testimony that, "[w]e started working together and developing those drop off fuel systems." Ex. U, at 25:16.  "Almost all my time we are spending and developing this application."  *Id.*  Plaintiffs ignore all the testimony on page 28 of Gitman's transcript, perhaps because the information is so technical that only a scientist – like Gitman or Oleg -- can understand it. Ex. U, at 28.  Plaintiffs apparently doubt the ability of these scientists, because Gitman's background is not in biology. Mot. at 12.  (Are plaintiffs somewhere claiming that *Giventer* does have the ability to deal with the scientific background and foundation of Agro and its newly-acquired patents??)[9]

---

[9] Plaintiffs' counsel ignorantly also argued with Gitman concerning Russian names, and expressed contempt and incredulity at Gitman's assertion that Russian surnames are different for

*(continued...)*

- 15 -

The deposition transcript, however, tells a different story. It shows Gitman talking openly about the work Giventer does for Agro. Ex. U, at 31:7-23.  Gitman testified that Giventer could receive a salary if and when the business is up and running.  Ex. U, at 31:7-23. He testified further that Giventer was to receive a piece of the business at some point in the future, but the amount had not yet been decided.  Ex. U, at 31:7-23. Plaintiffs' motion asserts, "[h]owever, Gitman has also suggested that Giventer might have an undisclosed ownership interest in the companies." Mot. at 14.  The testimony was, however, "plus, he will have ownership in the company." Ex. U, at 31: 17-18.  Rather than trying to "hide" information about Giventer, Gitman openly volunteered that Giventer could be getting stock in the company at some point. Ex. U, at 49:5-20.  The testimony clearly is not of a witness trying to hide anything.  Gitman went on to explain that exact terms had not yet been reached. Ex. U, at 31:20-21.

There are also pages of testimony concerning Bob Miller, Ex. U, at 62:7, and other meetings related to getting the business going. There are numerous details to all these statements – the kinds of details that only veracity provides. Ex. U, at 33:5-25.  By contrast, Mr. Levin proffers hearsay testimony that Bob Miler claimed he dealt only with Giventer.  There are pages of testimony in which Mr. Gitman explains that he invested money and that the decisions were made by him and Oleg, and not with Giventer. Ex. U, at 42-43.  Mr. Gitman explained that, while Oleg is an excellent engineer; he does not have business acumen. Ex. U, at 56:1-12.  And whether or not that means he had to have had help forming a corporate entity, it does not establish that Gitman is being "used" to hide assets for Giventer.

Mr. Levin tried to trip-up Mr. Gitman, and tried to get him to acknowledge that he would not want Giventer's name on any paperwork, even if he were heavily involved.  Mr. Gitman, however, responded that, in light of plaintiffs allegations, he would not want such a partner.  Ex. U, at 46:20-25.

As Mr. Levin is undoubtedly aware, Mr. Gitman is listed in Sunbiz as the officer or owner of no less than 24 businesses. He is not uneducated. He uses known, well-established

---

men and women.  Plaintiffs' counsel was apparently convinced that Oleg was operating under an "alias" – and only wanted Gitman to confirm that ridiculous supposition.  Ex. U, at 56 and 57.

JAROSLAWICZ LAW OFFICES
1177 Kane Concourse #222 ● Bay Harbor Islands, Florida 33154 ● T 305.398.7739 ● F 786.206.3575 www.MyLawyerIsaac.com

corporate lawyers at Greenberg Traurig and Hunton & Williams to help structure his business affairs with the Agro Entities and their possible financing, and uses on-line incorporating services when appropriate. Ex. U, at 62:7. There is nothing in *Gitman's* record or testimony that would lead one to think he was or is using a corporate entity to protect Giventer.

**Having Failed to Come Forward With Evidence, Plaintiffs Must Resort
to Impermissible Racial Profiling Based Upon Nationality and Immigrant Status**

Perhaps recognizing that their motion and supporting affidavit is simply replete with mischaracterizations of Gitman's testimony, conjecture and suppositions, plaintiffs must finally resort to the lowest level by engaging in racial profiling:

> "Gitman and Giventer are both Russian immigrants. The Russian community in South Florida is very tightly knit and historically, even new friends or acquaintances will go to great lengths in order to assist another, even if it means committing perjury."

Mot. at 13.

In *Newby v. Enron Corp.*, 188 F. Supp.2d 684 (S.D. Tex. 2002), the court noted that it is not sufficient to lump defendants together and assert a threat of dissipation. In *Enron,* an expert testified as to the likelihood of concealment and dissipation, based upon his experience. It was not enough. [10]  Here, as in *Enron,* Plaintiff must show that the particular party whose assets are to be restrained is likely to conceal or dissipate. There have been no factual allegations made here,

---

[10] In cases where a pre-judgment asset-freezing injunction is granted, courts have been presented with allegations ***and evidence*** showing that the defendants were concealing assets, were transferring them so as to place them out of the reach of post-judgment collection, or were dissipating the assets at issue. *See, e.g.*, United States ex rel. Rahman v. Oncology Associates P.C., 198 F.3d 489, 493 (4th Cir. 1999) (uncontradicted allegations that defendants had transferred assets to Caribbean Island and were selling main assets of the corporation); *Deckert v. Independence Shares Corp.,* 311 U.S. 282, 291 *(1940)* (defendant insolvent and giving preference to foreign creditors seeking payment); *Republic of Panama v. Air Panama Int'l, S.A.*, 745 F. Supp. 669 (S.D. Fla. 1988) (defendants attempting to transfer assets of national airline to illegitimate government of Panama, putting the assets outside the reach of the court); *Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) (upholding asset freeze based on allegations that defendants had internationally transferred personal assets and had used false identities to transfer assets to a Liechtenstein trust, using Swiss banks, for their benefit).

JAROSLAWICZ LAW OFFICES
1177 Kane Concourse #222 ● Bay Harbor Islands, Florida 33154 ● T 305.398.7739 ● F 786.206.3575 www.MyLawyerIsaac.com

let alone evidence, that any assets under the control of Mr. Gitman are at risk for dissipation, being transferred or concealed.  The most Plaintiffs were able to assert here was that there was a *possibility* the assets would be diverted because this particular group -- Russian immigrants -- are "loyal" to each other.  Mot. at 13.   In the *Enron* case, too, plaintiff tried to lump all the defendants together as a group, and had expert testimony that there was a great likelihood of having assets or dissipation. The court correctly concluded, however, that, "[a] careful review of the record does not disclose the necessary showing that the individual defendants will remove the assets from the reach of the plaintiffs, so as to cause irreparable injury absent an asset freeze." 188 F. Supp.2d  at 708.

The only thing Mr. Levin raises is that members of a particular ethnic group lie for one another and will perjure themselves. Mot. at 13.  The motion then discusses ***other*** people who supposedly have lied.  Mr. Levin apparently seeks guilt by association.  Plaintiff includes pages of seeming connections to Giventer, Mot. at 15, obviously hoping to compel this Court to conclude that Gitman is guilty by association – with people who know Giventer:  without a shred of evidence against Gitman, or even credible inferences, Plaintiffs' motion goes on with this racist libel to relate stories of someone named Igor Kozlik who is apparently "accused" of wrongdoing.

> In the Texas bankruptcy litigation, for instance, Giventer's businesses were catapulted forward by his relationship with a New York investor and businessman named Igor Kozlik ('Kozlik'), who is also Russian . . . . Giventer has now found himself the next 'Kozlik': Jacob Gitman."
> Mot. at 13-14.

As a basis for a TRO, such discriminatory profiling cannot be tolerated as a matter of law.  What Mr. Levin wishes to accomplish in obtaining a TRO under these circumstances is a state-sanctioned restraint of use of property on the basis of little more than impermissible racial profiling.

### The Balance of Hardship Militates Against an Injunction

Plaintiffs' motion engages in a lopsided analysis of the required "balancing" of hardships to obtain an injunction.  Incredulously, plaintiffs assert that, "Third, the harm that will befall Giventer from a TRO, if any, is far outweighed by the harm that will befall State Farm if the Court

- 18 -

does not prevent Giventer from engaging in potentially wasteful or fraudulent transactions. " Mot. at 19.  However, that is obviously *not* the correct analysis.  The prospective (and ultimately-realized) harm is to *Gitman*.  Plaintiffs have not forward with even an allegation that Gitman is anything other than a reputable businessman, heretofore without a blemish to his reputation.  As will be demonstrated at an evidentiary hearing related to the harm that plaintiffs' action has caused, Gitman has suffered significant harm: his offices were raided by a troop of marshalls, a forensic team and law enforcement personnel in a raid worthy of a crime kingpin: at least 16 agents raiding an office in Bal Harbor Islands just a few blocks from the Bal Harbour Shoppes.  Any continued freeze on assets and disclosure of personal, confidential documents and information without a finding – based upon admissible evidence – that Agro is really Giventer's, is unjustified and inequitable.  Amongst other things that will ultimately come out at an evidentiary hearing, plaintiffs' counsel's conversations with Bob Miller put the "kibosh" on a public financing deal that was pending.

As the cases cited above demonstrate, the remedy sought here is an extraordinary one.  In the absence of admissible evidence against the party sought to be restrained, Gitman submits that it goes against  public policy to grant the injunction in light of the type of distasteful allegations made against Gitman – almost exclusively because of his nationality.

### The Request for a TRO Was Improper and Disingenuous, Particularly As To Plaintiffs' Claims of the Necessity for Immediate Action and an *Ex Parte* Hearing and Order

The standard for preliminary injunctions and TROs requires that the harm be imminent and irreparable. In the instant case, the record demonstrates that there was no urgency. As in *Charlesbank Equity Fund II v. Blinds to Go*, 370 F.3d 151 (1st Cir. 2004), Plaintiff's "cries of urgency are sharply undercut by its own rather leisurely approach to the question of preliminary injunctive relief." That chronology has evidentiary significance: delay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm.  *See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 295 F. Supp.2d 366, 390 (S.D.N.Y. 2003). The longer the delay, the more pervasive the doubt.  *Charlesbank Equity Fund II v. Blinds to Go*, 370 F.3d 151 (1st Cir., 2004).

- 19 -

In *Charlesbank Equity,* plaintiff waited more than a year after the commencement of the action to seek an injunction.  Here, the delay factor is exacerbated by the conduct of plaintiffs' counsel over eight months ago.  Plaintiffs' counsel sent Mr. Gitman *and Giventer* an email dated March 12, 2010, stating: "Is there anything left of the business?  Just in case, we're going to file these next week." *See* exhibit "1" attached hereto.  Attached to that e-mail were four documents, attached hereto as Exhibits "2"- "5."[11]  Six days later, on March 18, 2010, Mr. Levin sent yet another e-mail to Gitman and Giventer: ""Do you want to simply turn Agro over since it isn't doing business anymore or shall I file this and do it formally?" *See* Ex. "6" attached hereto.

Clearly, if Mr. Gitman were to secrete assets or records, he could and would have done so by now – having had eight months notice of plaintiffs' intent.  Indeed, plaintiffs' counsel even tipped off *Giventer.*

Yet suddenly, in November, 2010, eight months after tipping their hand to Gitman *and Giventer*, plaintiffs apparently decided that they absolutely needed to approach this Court *ex parte* and obtain a temporary restraining order.  Had plaintiffs really believed that secrecy and speed were necessary, they would have acted with alacrity and secrecy to obtain their TRO months earlier.  Instead, they showed their hand – and yet bided their time and then came running into this Court *ex parte,* neglecting to tell this Court that both Gitman *and Giventer* had an advance copy of the Motion as early as March, 2010. Just as in *Charlesbank Equity Fund,* the evidence of plaintiffs' counsel's own actions belie the representations they made to this Court.  Had Gitman wanted to secrete assets, he would have and could have done so long ago. And plaintiffs knew that all along.

The TRO should immediately be dismissed.

---

[11] "PLAINTIFFS' MOTION TO COMPEL PRODUCTION BY AGRO-ENERGY HOLDING, LLC" (Ex. "2"); "PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL PRODUCTION BY AGRO-ENERGY HOLDING, LLC" (Ex. "3"); "PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR APPOINTMENT OF A RECEIVER" (Ex. "4"); and "PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR APPOINTMENT OF A RECEIVER." Ex. "5."

JAROSLAWICZ LAW OFFICES
1177 Kane Concourse #222 ● Bay Harbor Islands, Florida 33154 ● T 305.398.7739 ● F 786.206.3575 www.MyLawyerIsaac.com

**WHEREFORE**, Respondents respectfully request that this Court issue an Order: (1) immediately dissolving the Temporary Restraining Order issued on November 5, 2010 [DE 13]; (2) reserving jurisdiction to hear Respondents' motion for appropriate sanctions against all deserving persons; and (3) granting such other and further relief that this Court may deem just and proper.

Date:   November 18, 2010                      Respectfully submitted,

                                                _s/: Isaac M. Jaroslawicz
                                                Isaac M. Jaroslawicz, Esq.
                                                Florida Bar No. 979510
                                                E-mail address:  Isaac@MyLawyerIsaac.com
                                                **JAROSLAWICZ LAW OFFICES**
                                                1177 Kane Concourse, #222
                                                Bay Harbor Islands, Florida 33154
                                                Telephone:      305.398.7739
                                                Facsimile:      786.206.3575
                                                *Counsel for Respondents*

- 21 -

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 18, 2010, I served the foregoing document on all

counsel of record or pro se parties identified on the attached Service List via hand-delivery or

will make such service via transmission of Notices of Electronic Filing generated by CM/ECF or

in some other authorized manner for those counsel or parties who are not authorized to receive

electronically Notices of Electronic Filing.

 s/: Isaac M. Jaroslawicz
Isaac M. Jaroslawicz, Esq.
Florida Bar No. 979510
E-mail address:  Isaac@MyLawyerIsaac.com
**JAROSLAWICZ LAW OFFICES**
1177 Kane Concourse, #222
Bay Harbor Islands, Florida 33154
Telephone:    305.398.7739
Facsimile:      786.206.3575
*Counsel for Respondents*

- 22 -

<u>**SERVICE LIST**</u>

**State Farm Mutual, etc. v. Stein**
**CASE NO.:  02-20245-cv-HUCK/O'SULLIVAN**
**United States District Court, Southern District of Florida**

**Charles H. Lichtman, Esq.**
Berger Singerman
Las Olas Centre II
350 E. Las Olas Blvd., Suite 1000
Fort Lauderdale, FL 33301
Tel: 954-525-9900
Email: clichtman@bergersingerman.com
*Lead Attorney for Plaintiffs*

**Richard A. Pollack**
Berkowitz Dick Pollack & Brant, LLP
200 South Biscayne Blvd., 6th Fl.
Miami, FL 33131
Tel: 305-960-1214
Email: rpollack@bdpb.com
*Forensic Custodian for the Court*

**Neal H. Levin, Esq.**
Freeborn & Peters, LLP
311 S. Wacker Drive, Suite #3000
Chicago, IL 60606
Tel: 312-360-6000
Email: nhlevin@freebornpeters.com
*Pro Hac Vice attorney for Plaintiffs*

JAROSLAWICZ LAW OFFICES
1177 Kane Concourse #222 ● Bay Harbor Islands, Florida 33154 ● T 305.398.7739 ● F 786.206.3575 www.MyLawyerIsaac.com