# Exhibit "5"

Draft dated March 15, 2010

from Neal H. Levin, Esq.,
Freeborn & Peters LLP
to
Jacob Gitman
and
Michael Giventer

"PLAINTIFF'S MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION FOR A
TEMPORARY RESTRAINING ORDER AND
FOR APPOINTMENT OF A RECEIVER"

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 02-20245-CIV-HUCK
Hon. Paul C. Huck

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, et al.,

       Plaintiffs,

vs.

SLAVIK STEIN, SEMYON SLADKEVICH,
et al.,

       Defendants.

_____/

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A
TEMPORARY RESTRAINING ORDER AND FOR APPOINTMENT OF A RECEIVER**

## <u>INTRODUCTION</u>

Michael Giventer ("Giventer") owes State Farm $8.6 million plus millions of dollars in interest, attorneys fees and costs based upon a judgment (the "*Judgment*") from the District Court for the Southern District of Texas stemming from his role in a far-reaching insurance fraud scheme. For years, Giventer has avoided paying the Judgment by hiding assets and using other people and companies to generate income. This Court should enter a temporary restraining order ("TRO") to preserve the *status quo* concerning what appears to be Giventer's latest vehicle for generating income and hiding his assets from State Farm and other creditors. The Court should also appoint a receiver or, alternatively, a special fiscal agent to enforce the TRO.

State Farm obtained the Judgment against Giventer in 2001. In the insurance fraud scheme at issue, Giventer performed phony chiropractic services and submitted false insurance claims. As State Farm moved closer and closer to enforcing its Judgment, Giventer declared bankruptcy. Giventer's bankruptcy filing was only one in a string of transactions he has used to shield his money from creditors. For example, Giventer has used his ex and current wives to transfer assets, receive income, and hide money. Giventer, using the name of his current wife, Julia Shvabskaya ("Ms. Shvabskaya"), also set up a complex maze of corporations and partnerships through which he received millions of dollars in income. Giventer and Ms. Shvabskaya also gave conflicting testimony during examinations in Giventer's bankruptcy proceeding regarding the nature of their income, assets, and the use of their money. They have even destroyed computer data in order to prevent the creditors from learning the true nature of Giventer's finances and business dealings.

Now, it appears that Giventer is using his father-in-law, Oleg Shvabsky ("Oleg") as the "straw person" here in this District to make money and hide it from State Farm. Three Florida

entities, Agro-Energy Holdings, LLC, Agro-Energy Holdings International, Inc., and Agro-Energy USA Inc. (collectively, "Agro"), were created using Oleg's name at the behest of Giventer since Oleg cannot speak English, is not a businessman, and such a scenario fits with Giventer's long history of having others form corporations that Giventer actually controls.  It is clear that Giventer has his fingers all over Agro, assisting it in securing contracts and positioning himself to earn a salary, commissions, and ownership as the companies get off the ground.

At every turn, Giventer has attempted to avoid his obligations to State Farm and other creditors, all the while using others to generate millions of dollar in income.  Agro is just the latest step in his plan to make money that he can hide from creditors.  Unless this Court issues a TRO and appoints a receiver to investigate and take control of Agro, State Farm and other creditors will yet again be forced to stand by while Giventer continues to shelter his assets from attachment in satisfaction of the Judgment.

## BACKGROUND FACTS

### Giventer's Insurance Fraud Scheme

Between 1992 and 1997, Giventer controlled chiropractic and pain clinics that submitted fraudulent insurance claims based on deliberately-caused automobile collisions.  (*See* Findings of Fact and Conclusions of Law at ¶ 1, *State Farm Mut. Auto. Ins. Co., et. al. v. Stein, et. al.*, Civil Act. No. H-98-4150 (S.D. Tex. 2001), attached as Exhibit A.)  The collisions were caused by drivers of older cars intentionally targeting and slamming on their breaks in front of other cars. (*Id.*)  The drivers and passengers of the cars that intentionally slammed on their breaks (the "Front Cars") falsely claimed to have experienced soft tissue injuries.  (*Id.* at ¶ 5.)  The passengers of the Front Cars pretended to receive treatment from Giventer's chiropractic clinics for their phony injuries.  (*Id.* at ¶ 26.)  Giventer, through his clinics, then billed insurance

companies for the work he claimed to have performed.  Giventer received millions of dollars in improper payments through his scheme.  (*Id.*)

In 1998, State Farm filed a lawsuit against Giventer and others in the United States District Court for the Southern District of Texas alleging that Giventer's actions in operating the chiropractic clinics amounted to insurance fraud.  (*State Farm Mut. Auto. Ins. Co., et. al. v. Stein, et. al.*, Civil Act. No. H-98-4150 (S.D. Tex. 2001).)  The case proceeded through 2001.  (*Id.*)

At the same time, the United States Attorney for the Southern District of Texas commenced criminal proceedings against Giventer relating to the his role in the insurance fraud scheme.  (*See United States v. Giventer*, Criminal No. H-01-168 (S.D. Tex. 2001).)  On March 12, 2001, Giventer entered into a plea agreement with the United States Attorney.  (*See* Plea Agreement, *United States v. Giventer*, Criminal No. H-01-168 (S.D. Tex. 2001), attached as Exhibit B.)  Giventer agreed to plead guilty to filing fraudulent tax returns in return for avoiding jail time.  (*Id.* at ¶¶ 1, 3.)  Giventer ultimately was required to remain on probation for 5 years.

Then, on December 7, 2001, the District Court entered a civil judgment against Giventer, holding that he had submitted false insurance claims, laundered money, and destroyed evidence.  (*See* Final Judgment, *State Farm Mut. Auto. Ins. Co., et. al. v. Stein, et. al.*, Civil Act. No. H-98-4150 (S.D. Tex. 2001), attached as Exhibit C.)  The court ordered him to pay $8.6 million in damages to State Farm, plus interest, attorneys fees and costs.  (*Id.* at 2.)

**Giventer and His Wife Move To Florida
and Create a Web of Corporate Entities to Hide Assets**

In late 1997, foreseeing that his insurance fraud scheme in Texas could lead to criminal and civil liability, Giventer hatched a plan to place his assets out of creditors' reach.  In the first stage of his plan, Giventer and his then-wife, Margaret Giventer, filed sham divorce proceedings with the intent of transferring Giventer's assets to Margaret.  (*See* Affidavit of Michael Giventer

3

at ¶¶ 6-11, *State Farm Mut. Auto. Ins. Co., et. al. v. Stein, et. al.*, Civil Act. No. H-98- 4150 (S.D. Tex. 2001), attached as Exhibit D.)

Pursuant to the divorce, Giventer and Margaret entered into a marital settlement agreement that effectively transferred all of Giventer's property to his ex-wife. (*Id.* ¶ 10.) Although the divorce became final on March 31, 1998, they continued to live together, and in all respects acted as husband and wife. (*Id.* at ¶ 11.) The sole reason for divorcing was so that, through the divorce proceedings, Giventer could transfer his assets to his ex-wife where they would be beyond the reach of creditors and law enforcement. (*See id.* at ¶¶ 6-7.)

In late 1999, Giventer and Margaret actually separated and ended their romantic relationship. (*Id.* at ¶ 11.) In late 1999 or early 2000, his current wife, Ms. Shvabskaya, moved from Los Angeles to south Florida to live with Giventer. (9/15/01 Deposition of Julia Shvabskaya at 52, 58, attached as Exhibit E; 11/10/06 Deposition of Julia Shvabskaya at 62, attached as Exhibit F.) At the time, Ms. Shvabskaya had approximately $40,000 to her name. (Exh. E at 62-63.) When she moved, she gave approximately $10,000-$15,000 of that money to her parents. (*Id.* at 63.) When Ms. Shvabskaya arrived in Florida she was not employed and had approximately $25,000 to $30,000. (*Id.*)

In approximately June 2000, despite her small amount of money, and despite her lack of employment, Ms. Shvabskaya signed a lease for a $2700-per-month apartment in which she and Giventer lived. (*Id.* at 63-69.) At the time Ms. Shvabskaya signed the lease, and while she was making rent payments, she still was not employed. (*Id.* at 69-70.) Within a year and a half, Ms. Shvabskaya moved to a new apartment with rent of $3100 per month. (*Id.* at 71-74.) She did not personally meet with the realtor to view that property. (*Id.* at 73.) Rather, Giventer met with the realtor and chose the property. (*Id.*) Nevertheless, Ms. Shvabskaya signed the lease. (*Id.*)

Within two months after moving to Florida with no job and $25,000 to her name, Ms. Shvabskaya incorporated a company called Open Diagnostic Imaging, Inc. ("Open Diagnostic") at Giventer's urging.  (*Id.* at 25-26, 76-79.)  Open Diagnostics is just one of the many companies involved in Giventer's scheme, which now includes Agro.  Ms. Shvabskaya allegedly formed Open Diagnostic after Giventer introduced her to a man that presented a business opportunity for Ms. Shvabskaya to invest in a new company that would provide physical rehabilitation services. (*Id.* at 78-80; Exh. F at 24-27.)  During 2001, after she had purportedly incorporated Open Diagnostic, Ms. Shvabskaya did not know the nature of Open Diagnostic's business.  (Exh. E at 76.)  Although on paper Ms. Shvabskaya is Open Diagnostic's sole shareholder, she has been able to provide virtually no information about the company.  During two separate depositions, Ms. Shvabskaya was not able to give any specifics about how Open Diagnostic invests its assets, how the investments are managed, how the investments are chosen, or about the companies in which Open Diagnostic invests.  (*See* Exh. E at 80-87, 99-102; Exh. F at 26-33.)

Open Diagnostic was just one of many companies for which Giventer engaged Ms. Shvabskaya as his "straw person."  This scheme of forming entities by involving Ms. Shvabskaya continued, and Giventer and Ms. Shvabskaya organized the various entities in a complex maze of partnership and member arrangements.  It is clear that Giventer and Ms. Shvabskaya have used their best efforts to conceal Giventer's affiliations with companies allegedly owned by Ms. Shvbskaya.

**Giventer and Ms. Shvabskaya Enter Into a**
**Fraudulent Premarital Agreement To Shield Giventer's Assets**

In order to ensure that his companies' future assets would remain out of creditors' hands, Giventer employed Texas family law to create a fictional divide between him and his companies' assets.  The premarital agreement states:

> Michael [Giventer] agrees that all property of any nature or in any place, including, but not limited to, the earnings, income, and appreciation resulting from Julia's [Shvabskaya] personal services, skill, effort and work, or acquired by or coming to Julia by purchase, gift, inheritance, or from any liquid investments, such as money market accounts, stocks and bonds or other investments or profits, business, partnership, limited liability company, joint venture or any other entity or other means during the marriage shall be Julia's separate property . . . .   It is clearly understood that no money earned by either party during the marriage will be community property, but instead will be and remain the separate property of the party so earning it.

(*See* Premarital Agreement, attached as Exhibit G, at § 3.3b.)  The premarital agreement contains a similar clause regarding property or assets Ms. Shvabskaya possessed prior to the marriage. (*Id.* at § 3.3a.)  In effect, the premarital agreement purports to ensure that no money earned by Julia through Open Diagnostic or other companies will be available to creditors as community property under Texas law.  Nonetheless, despite requests to see the scheduled property, neither Giventer, Ms. Shvabskaya nor either of their attorneys have been able to produce the same.

**Giventer and His Wife Lead a Lavish**
**Lifestyle Without Paying Giventer's Creditors**

Once Giventer succeeded in starting his companies, placing them in his wife's name, and using the pre-marital agreement to shield the couple's assets, money began pouring in for the couple.  Giventer and Ms. Shvabskaya led a lavish lifestyle, fueled by their schemes.  Until recently, the couple lived in a $2.2 million home.  (*See* Exh. F, 11/10/06 Shvabskaya Dep., at 11-12; 150-51.)  The house abutted a waterway that provided access to the Atlantic Ocean.  Over the last several years, Ms. Shvabskaya has leased two different Porsche automobiles, an Infiniti sport utility vehicle, an Audi, and a BMW, among others.  (4/20/06 Section 341 Meeting, attached hereto as Exhibit H, at 55-56; Exh. F, 11/10/06 Shvabskaya Dep., at 114, 126-27.)   Ms. Shvabskaya also purchased a boat for approximately $283,000 that the couple kept at a dock in the back yard of their property.  (*See* Exh. F, 11/10/06 Shvabskaya Dep. at 189-90, 213.)

**Giventer and Ms. Shvabskaya**
**Hide and Destroy Evidence**

In November 2005, with State Farm attempting to enforce its Judgment against him and on the eve of dismantling his new business scheme, Giventer filed for bankruptcy protection in the Southern District of Texas, despite the prohibition from attempting to discharge this obligation per his Plea Agreement. In the bankruptcy action, the Trustee and State Farm filed a motion with the Court to compel Giventer and his wife to allow inspection of their computers. The Court granted the Trustee and State Farm leave to inspect the computers. (*See* Order Granting State Farm's and the Trustee's Emergency Joint Motion to Compel Production of Computers, attached as Exhibit I.) The order applied to all computers – those possessed by Giventer and Ms. Shvabskaya. On October 31, 2006, a computer forensic analyst arrived at Giventer's home to inspect the computers. (*See* Declaration of Jesus Pena at ¶ 3, attached as Exhibit J.) Upon inspecting the images, it was concluded that:

(A)     the data on the first hard drive was intentionally destroyed and new information was placed on the hard drive the day prior to its inspection (*See* Declaration of Chad Gough at ¶ 2, attached as Exhibit K);

(B)     the data on the second hard drive was intentionally destroyed and no new information was placed on the hard drive (*see id.*); and

(C)     the data on the third hard drive either was destroyed and new information was placed on the hard drive the day prior to inspection or the hard drive was brand new and placed in the computer the day prior to inspection. (*See id.*)

In addition to destroying computer evidence, Giventer and Ms. Shvabskaya have given false or conflicting testimony in order to prevent the Trustee and State Farm from determining the source of their income. When asked during the April 20, 2006 section 341 meeting of the

creditors about the nature of his family's income, assets, expenditures, and businesses, Giventer indicated that Ms. Shvabskaya has all knowledge relating to those items.  (*See* Exh. H, 4/20/06 Section 341 Meeting, at 40-42, 48-49, 54; 8/17/06 Section 341 Meeting, attached as Exhibit L, at 17-18.)  Ms. Shvabskaya testified on November 10, 2006, however, that she does not know how the companies she purportedly owns generate income.  (*See* Exh. E, 9/15/01 Shvabskaya Dep., at 80-87, 99-102; Exh. F, 11/10/06 Shvabskaya Dep., at 26-33.)

Giventer also lied about his access to his wife's money.  At his section 341 meetings Giventer testified that he does not have access to his wife's credit cards.  (*See* Exh. H, 4/20/06 Section 341 Meeting, at 57-59; Exh. L, 8/17/06 Section 341 Meeting, at 25.)  At her Rule 2004 deposition on November 10, however, Ms. Shvabskaya testified that Giventer has a credit card connected to her account, which Giventer uses.  (*See* Exh. F, 11/10/06 Shvabskaya Dep., at 84.)

Giventer's and his wife's inconsistent testimony is yet another effort by the couple to hide assets and information from creditors. At every turn, Giventer and Ms. Shvabskaya have hidden or destroyed information the Trustee and creditors need in order to establish the nature of Giventer's estate.

**Giventer Now Continues His Plan To Hide
Assets Using His Father-in-Law And Agro**

Now, here in this District, Giventer has involved his father-in-law, Oleg, as his "straw person" for Agro in another attempt to avoid paying State Farm.  Each of the three Agro-Energy Entities are registered with the state of Florida.  (*See* Corporate Details, attached hereto as Exhibit M.)  Oleg and a man named Yakov Gitman ("Gitman") are listed as Manager/Members or Officer/Directors for each of the three Agro-Energy Entities.  (*Id.*)  Agro also has a website at www.agroenergyusa.com, which contains a page introducing viewers to the company, its

strategy, and its management team, which includes Oleg and Gitman.  (*See* Welcome Page, attached hereto as Exhibit N; About Us Page, attached hereto as Exhibit O.)

In his deposition, Gitman testified that Oleg formed Agro Energy Holdings LLC, the company through which the Agro group of businesses currently transacts.  (*See*  12/29/09 Deposition of Yakov Gitman, attached as Exhibit P, at 10, 40, 64).  Oleg ostensibly invested $200,000 in Agro.  (*Id*. at 55.)  But Gitman  testified that he did not know how Oleg got the money to pay for his $200,000 investment in Agro, though Gitman admitted that it was a good question.  (*Id.*)  Although Gitman said that Giventer never told him that the Judgment is the reason why he can't put his name on any companies, Gitman admitted that it is "kind of obvious" why Giventer doesn't want his name on any company.  (*Id*. at 46.)  Oleg does not speak English. (*Id*. at 40)  Gitman testified that Oleg is "not ambitious at all" and that Oleg is not a businessman.  (*Id.* at 40, 43.)  In fact, when being questioned about the organizational documents for Agro Energy Holdings LLC, Gitman admitted that neither he nor Oleg understand the documents.  (*Id*. at 65-66.)

Gitman first met Oleg either in 2007 or the beginning of 2008 on the beach while Oleg was taking care of Giventer's kids.[1]  (*Id*. at 11.)  At that time, Giventer was going by the name of Michael Blanc.  (*Id*. at 11.)  Ms. Shvabskaya also has an alias with the last name of Blanc.  Later, Gitman met Giventer at a party in his condominium building, which was in fact the same condominium building where Giventer lived.  (*Id*. at 12, 24.)  It was not until after Gitman had met Giventer that Gitman became involved in Agro.  (*Id*. at 24)  And, prior to becoming the operating manager and making his first investment of $100,000, Gitman had discussed the idea of a fuel drop off system with Giventer, which is one of the components involved in Agro's business.  (*Id*. at 26, 42, 55.)

Agro has a plant in the Ukraine.  (*Id*. at 29.)  Giventer assists Agro in the Ukraine by securing various contracts, and he spends a majority of his time there.  (*Id*. at 30.)  Additionally, Giventer set Gitman up with a consultant for Agro, who Giventer knew from before.  (*Id*. at 76-77.)

Gitman and Giventer are both Russian immigrants.  The Russian community in South Florida is very tightly knit and historically, even new friends or acquaintances will go to great lengths in order to assist another, even if it means committing perjury.  In the Texas bankruptcy litigation, for instance, Giventer's businesses were catapulted forward by his relationship with a New York investor and businessman named Igor Kozlik ("Kozlik"), who is also Russian.  (*See* Fifth Amended Adversary Complaint at ¶¶ 4-5, 115-119, *In re Michael Giventer*, Bankruptcy Case No. 05-71496, Adv. No. 06-01027 (Bankr. S.D. Tex. 2009), attached as Exhibit Q.)  Kozlik has been accused of a variety of wrongdoing in several bankruptcy proceedings in Texas, including Giventer's where there are counts against him for conversion, turnover of matured debt, and breach of fiduciary duties.  (*Id*. at ¶¶ 129-152.)  Kozlik lied continually under oath while testifying as to Giventer's involvement in the pain clinic businesses.  Additionally, in contravention of a prior court order that precluded any payments from entities involved in the bankruptcy litigation (*see* 6/20/07 Order Granting Preliminary Injunction, attached hereto as Exhibit R), Kozlik received a salary of $158,733.00 paid by two of the entities involved (*see* Salary Payment Summary, attached hereto as Exhibit S), a company wholly owned by Kozlik named Global Portal, Inc. improperly distributed $139,812.00 into its pension fund that was in essence a direct payment to Kozlik (*see* July 2007 Global Portal Statement of Operations at p. 2, attached hereto as Exhibit T), and Global Portal, Inc. improperly distributed $80,000.00 to Kozlik's son for "Consulting/Management Fees" (*see id*).  Kozlik is now accused of wrongfully

---

[1] Giventer's wife, Ms. Shvabskaya, is Oleg's daughter.  (Exh. P at 13)

funneling money to Giventer, sheltering Giventer's assets and involvement in business transactions and entities, and attempting to wrongfully salvage businesses destroyed by Giventer when State Farm closed in.

Giventer has now found himself the next "Kozlik": Mr. Gitman.  Though Gitman is attempting to use his business acumen to legitimately develop a bio-fuel enterprise, State Farm has come knocking and he must now do what he can to shelter the businesses from Giventer's past.  To that end, and in suggesting that Giventer is a penniless nomad, Gitman purportedly pays for Giventer's trips to the Ukraine, living expenses there including accommodations and food, and also paid for a debt that Giventer owed and his apartment rental.  (Exh. P at 30-31.)  Gitman further suggests, in shielding Giventer's true value to the companies, that once Agro is fully operational and funded, Giventer will have a salary of merely $5,000 a month.  However, Gitman has also suggested that Giventer might also have an undisclosed ownership interest in the companies.  (*Id*. at 31)  He will also make commissions on sales.  (*Id*. at 31)

For the past year, Gitman and Giventer have been diligently working to develop their business into an international, bio-fuel powerhouse and have sought the guidance of an investor and advisor named Bob Miller ("Miller").  On information and belief, Miller, who was formerly a Canadian stockbroker, has taken companies public in the past and is positioning the Agro business for a reverse merger. (*Id.* at 49.)  The transaction will result in Giventer obtaining some stock in his name.  (*Id*.)  Miller himself confirmed that he only did business relating to Agro through Michael Blanc (aka, Giventer), and only dealt with Oleg once.  All of this evidence points to Giventer using Agro as just another one of his ploys to avoid paying State Farm the Judgment.

**ARGUMENT**

11

The Court's wide equitable discretion allows it to fashion remedies to protect judgment creditors. In light of the fact that Agro mirrors precisely the fashion in which Giventer has used colleagues and business entities in the past to shield his assets from State Farm and to frustrate any attempts to satisfy any portion of the Judgment, this Court should issue a TRO in this instance, as did the court in Texas, to preserve the *status quo* and aid State Farm in enforcing its Judgment. The TRO should prevent Argo and Giventer from hiding, wasting, or transferring any assets that would otherwise be available to satisfy State Farm's Judgment. In order to enforce the TRO, the Court should appoint a receiver to investigate, oversee, and control Agro's assets and income. In the alternative, the Court could consider the appointment of a "special fiscal agent" with the power to investigate and report on a company's income, assets, and operations.

## I. The Court Should Issue A Temporary Restraining Order ("TRO").

The standard for determining whether to issue a TRO or preliminary injunction is well established. The prerequisites for issuing a TRO or preliminary injunction are: (1) a substantial likelihood that the movant will prevail on the merits; (2) the movant will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to the movant outweighs the threatened harm an the proposed injunction may cause the opposing party; and (4) granting the injunction would not be adverse to the public interest. *United States v. Metropolitan Dade County*, 815 F. Supp. 1475, 1477 (S.D.Fla. 1993). Not surprisingly, courts have held that preliminary injunctive relief is appropriate to prevent defendants from hiding or wasting assets when evidence of past such behavior exists. *See Feit & Drexler, Inc. v. Drexler*, 760 F.2d 406, 416 (2d Cir. 1985) (upholding preliminary injunction where defendant had hidden and secreted assets); *Fairview Mach. & Tool Co. v. Oakbrook Intern., Inc.*, 77 F. Supp. 2d 199, 204-05 (D. Mass. 1999) (freezing defendant's assets to prevent waste pending trial on the merits). A TRO is a necessary

12

and reasonable measure to preserve the status quo to aid State Farm in enforcing its Judgment. *Fairview Mach. & Tool*, 77 F. Supp. 2d at 205.

Here, each of the prerequisites is met. First, the movant has already succeeded on the merits. The District Court in Southern Texas awarded State Farm a substantial judgment, which State Farm is now attempting to enforce. It is clear that Giventer owes State Farm money, and State Farm needs a TRO and a receiver to halt any further misappropriations of Giventer's assets via Agro. A TRO will help to ensure that the Agro will not become yet another vehicle for Giventer to hide assets and avoid his obligations. There is also substantial evidence that Giventer actually controls Agro and at least has an indirect financial interest in them. This evidence, together with the evidence that Giventer has a history of lying, destroying evidence, and utilizing corporations and colleagues to hide assets, demonstrates the likelihood that Giventer has assets affiliated with Agro that could be used in partial satisfaction of the Judgment.

Second, there is imminent danger that property of Giventer's estate will be lost, concealed, or transferred, irreparably harming State Farm and other creditors. The Court should interpret the evidence of Giventer's history of hiding assets, destroying evidence, and providing false testimony, along with the more recent testimony of Gitman and the findings relative to Agro, to indicate that Giventer already is concealing assets by utilizing Agro. Immediate action is necessary to ensure Giventer will not continue to destroy evidence or move assets.

Third, the harm that will befall Giventer from a TRO, if any, is far outweighed by the harm that will befall creditors if the Court does not prevent Giventer from engaging in potentially wasteful or fraudulent transactions. The relief sought by State Farm will not prevent Giventer, Agro, or anyone affiliated with Agro from engaging in transactions necessary to support themselves or to conduct their businesses. The relief simply will prevent out-of-the-

ordinary expenditures, will establish Giventer's interest, will limit the dilution of the assets, and will require regular reports to the Court of Agro's expenditures.

Finally, a TRO and preliminary injunction are in the public interest because it is in the public interest to enforce judgments. *U.S. v. U.S. Fishing Vessel Maylin*, 130 F.R.D. 684, 687 (S.D.Fla. 1990) ("the public interest lies in enforcing final judgments"). If insurance companies and other creditors are not aided by the Courts in enforcing their judgments against debtors, the cost of insurance and the cost of borrowing money will increase. It is also in the public interest to ensure that a person who has a history of defrauding people, companies, and the justice system will be held accountable for his actions. Additionally, the purpose of the bankruptcy laws is to allow a debtor to recover from financial hardship while ensuring that Creditors are compensated from Giventer's estate to the full extent allowed by the law. The bankruptcy laws also are intended to provide transparency to Giventer's estate to ensure that his creditors are treated fairly and to prevent Giventer from hiding or transferring assets. The relief sought here will further all of those goals by preserving Giventer's estate and creating transparency of Giventer's financial dealings. Without a TRO, Giventer will have the opportunity to use Agro to continue his history of utilizing various corporations in others' names to hide assets and avoid his legal obligations.

Therefore, State Farm requests that this Court enter a Temporary Restraining Order for fourteen days, or as extended by the Court, restraining Agro, as well as the officers, agents, and servants of Agro from:

1.  withdrawing, transferring or otherwise disbursing any funds from any source other than an amount to be determined by the court for basic, necessary business expenses for the benefit of Agro, without express authority of this Court;

2.  transferring, selling, assigning, dissipating, concealing, encumbering, impairing or otherwise disposing of, in any manner, any personal or real property, owned, managed, gained or acquired by Agro or Giventer without express authority of this Court, including movement of any personal property out of this State;

3.      opening or causing to be opened any safe deposit box or storage facility owned or managed by Agro or Giventer, or to which Agro or Giventer, or to which Agro or Giventer might otherwise have access, without the presence of a receiver or State Farm's attorneys;

4.      opening or causing to be opened any financial accounts of any type whatsoever, whether bank, investment, brokerage, money market or otherwise and whether domestic or international;

5.      forming or dissolving any entity or partnership, whether domestic or international; and

6.      deleting, altering or otherwise modifying any electronically stored data including, but not limited to, digital communications such as e-mail and attachments, voice mail and instant messaging, word-processing documents, spreadsheets, databases, calendar entries (such as Outlook), computer drawings, network access, Internet-usage files, presentations (such as PowerPoint), or any other documents or files created or stored on any computer, PDA or other information systems, including backup and archival files, in the possession and/or control of Agro or Giventer, excepting the review only of incoming e-mails and any responses thereto.

## II.    The Court Should Appoint A Receiver To Take Control Of Agro.

This Court should also appoint a receiver to enforce the TRO.  Even if it decides not to issue a TRO, this Court should still appoint a receiver.

Federal law governs whether this Court should appoint a receiver to take control of Agro. *See* FED. R. CIV. P. 66; *Nat'l P'ship Inv. Corp. v. Nat'l Housing Dev. Corp.*, 153 F.3d 1289, 1291 (11th Cir. 1998); *Calliope Capital Corp. v. Earthfirst Technologies, Inc.*, Case No. 8:08-CV-219-T-17TBM, 2008 WL 1995077 (M.D.Fla. May 6, 2008).  "The appointment of a receiver is a matter of judicial discretion, based on consideration of all of the relevant circumstances." *Calliope*, 2008 WL 1995077 at * 2.  Relevant factors considered by a Court in the appointment of a receiver include: (1) fraudulent conduct on the part of the defendant; (2) imminent danger that property will be lost or squandered; (3) the inadequacy of available legal remedies; (4) the probability that harm to the plaintiff by denial of the appointment would be greater than the injury to the parties opposing the appointment; (5) the plaintiff's probable success in the action

and the possibility of irreparable injury to his interests in the property; and (6) whether the interests of the plaintiff and others sought to be protected will in fact be well served by the receivership. *Id.* (*citing Consolidated Rail Corp. v. Fore River Ry. Co.*, 861 F.2d 322, 326-27 (1st Cir. 1988)); *see also Nat'l P'ship Inv. Corp.*, 153 F.3d at 1291 (citing factors listed in *Consolidated Rail Corp.* with approval).

The Court should appoint a receiver over Agro pursuant to its discretion given the relevant circumstances and history here. Numerous factors militate appointment of a receiver over Agro. First, as shown above, there is evidence that indicates the money flowing into and out of Agro is likely part of Giventer's estate. State Farm has a right to account for and collect on its Judgment from Giventer's estate's assets. In line with the companies in Ms. Shvabskaya's name, Giventer appears to now be using Oleg, Ms. Shvabskaya's father, to form companies for him. And, in line with the companies affiliated with Kozlik, Giventer appears to now be utilizing Gitman to propel Agro's business. Oleg cannot speak English, has been described as "not a businessman," and as one who cannot understand basic organizational documents. He's also been described as "not being able to tie his own shoes." However, Giventer wants his creditors and the courts to believe that Oleg incorporated and funded the companies on his own initiative. This, coinciding with Giventer's heavy involvement in the start up and operations of Agro, indicates more of the same type of fraudulent conduct Giventer has engaged in for years.

Second, additional fraudulent conduct likely will occur. In looking at Giventer's prior conduct, it is clear Giventer has a history of destroying evidence, providing inconsistent testimony, and using shell corporations and other people, including his wives and their parents, to hide assets, and incorporating businesses in other persons' names in order to hide his own ownership of the business. Giventer also has admitted to filing sham divorce proceedings in the

16

past in order to put his assets out of creditors' reach and he filed for bankruptcy protection on the eve of depositions to enforce State Farm's Judgment.  (Exh. D., Giventer Aff., at ¶¶ 6-11.)

At a minimum, Giventer's activities bear "badges of fraud" sufficient to warrant appointment of a receiver.

Third, there is imminent danger that property will be lost or concealed.  Giventer's lifestyle and destruction of evidence indicate that he already is concealing assets.  While he lived in a $2.2 million home and purchased $250,000 boats, he claimed he had no money to satisfy his Judgment to State Farm.  He also has destroyed evidence by wiping computer hard drives of their data.  Immediate action is necessary to ensure Giventer will not continue to destroy evidence or move assets now that State Farm has revealed the workings of Agro.

Fourth, legal remedies will not be adequate to determine the nature of Giventer's interest in Agro and protect it for creditors.  Giventer is using the legal bankruptcy process as a shield rather than to satisfy debts to creditors.  His conduct that led to the Judgment, his post-Judgment conduct including the Bankruptcy proceedings, and his present conduct reveal that Giventer operates outside the law and will not be swayed to disclose his finances as a result of legal relief.

Finally, appointment of a receiver is the best method for determining the nature of Agro's businesses and how Giventer uses that business to lead an opulent lifestyle.  The convoluted nature of the businesses requires appointment of an individual to investigate the internal relationships from the inside.  Giventer has done his best to hide the true nature of those companies and their earnings.  Absent an investigation from the inside out, Giventer will continue to use the companies to hide money and assets.

A preliminary injunction or TRO will only provide a partial solution.  An injunction requiring Giventer not to dissipate or move assets from or to Agro likely will be difficult to

thoroughly enforce without oversight.  Thus, the Court would be required to appoint an individual to monitor the companies for any improper disbursements or transfers.

In summary, the relevant factors outlined in *Calliope* weigh in favor of appointment of a receiver.  The Court therefore should use its judicial discretion, assess the relevant circumstances outlined above, and appoint a receiver.

Specifically, State Farm seeks the appointment of a receiver with the following rights, powers, and duties:

1. The right to immediately take possession and control of each and every asset owned or managed by Agro, including the right to secure any personal property as the Receiver deems necessary;

2. The right to immediate access to documents and records, including computers, PDAs and electronic stored data, related to the assets, finances or business of Agro;

3. The right to issue discovery to third-parties;

4. The right to divert mail directed to Agro;

5. The right to engage employees, agents, attorneys, accountants or other professionals for the purposes of executing upon the duties herein;

6. The right to sell any non-exempt property (and to challenge any claim of exemption) and to establish protocols for allowing claims by third parties to the proceeds therefrom;

7. The right to make payments and disbursements from the Estate as necessary to carry out the duties herein without prior order of court where doing so is necessary to preserve the assets of the Estate or otherwise effectively administer the Estate;

8. The right to sue for, collect, receive, take in possession, hold and manage any claims held by Agro and to seek Charging Orders as to any companies or limited liability companies in which Giventer may have an interest;

9. The receiver shall make monthly reports to the Court as to his/her activities and the assets seized, managed and/or sold and shall account for all fees and expenses incurred in furtherance of his/her duties;

10. The receiver will comply with all State and local rules as well as the Rules of this Court in fulfillment of his duties herein; and

11.   The receiver, or his employees, agents, attorneys and accountants, shall have immunity from all suits relative to the exercise of his powers hereunder.

**III.   If The Court Does Not Appoint A Receiver, It Should Appoint A Special Fiscal Agent.**

A receiver is both necessary and appropriate to enforce the TRO in this case.   If, however, the Court elects not to appoint a receiver, the Court should appoint a special fiscal agent.   Courts appoint special fiscal agents pursuant to their inherent and broad equitable powers. *Republic of the Philippines v. New York Land Co.*, 852 F.2d 33, 36 (2nd Cir. 1988).   A court is expected to "use the flexibility traditionally associated with equitable remedies" to protect the parties' rights.   *Id.*   That same flexibility also provides courts the power to mold a special fiscal agent's responsibilities to fit the facts of the particular case.   *See Leone Indus. v. Associated Packaging, Inc.*, 795 F. Supp. 117, 121-22 (D.N.J. 1992).

Courts generally appoint special fiscal agents where some degree of oversight is needed but the court wishes to avoid the perceived complications of appointing a receiver.   *See id.* at 121; *Republic of the Philippines*, 852 F.2d. at 36-37.   While a court's broad discretion to create equitable remedies grants it the power to consider a wide variety of factors when appoint a special fiscal agent, courts often consider factors similar to those that bear on appointing a receiver.   Thus, courts often consider: (1) whether the plaintiff has an interest in the property at issue; (2) whether the defendant is engaged in fraudulent conduct that may harm the plaintiff's interests; and (3) whether the plaintiff's property is in imminent danger of being lost, concealed, or diminished in value.   *See, e.g.*, *Leone Indus.*, 795 F. Supp. at 121.   As with all equitable remedies, courts also consider whether adequate legal remedies are available and whether a special fiscal agent will do more good than harm.   *See id.*

Courts have appointed special fiscal agents in situations similar to this case, where it was necessary to determine the nature of the defendant's assets to protect the plaintiff's assets in the

defendant's hands.  In *Leone Industries*, for example, the court appointed a special fiscal agent in order to ensure that the defendant complied with the court's temporary injunction, which required the defendant to provide an accounting of its assets and to cease engaging in certain types of transactions that could be wasteful.  *Id.* at 121.  Among the court's reasons for appointing the special fiscal agent was the need to investigate the nature of the defendant's assets and the need to ensure compliance with the injunction.  *Id.*  The court also noted that a special fiscal agent would not harm the defendant if he complied with the injunction and that a special fiscal agent would be the least intrusive means for ensure compliance.

The reasons for appointing a special fiscal agent are the same as those for appointing a receiver.  State Farm has an interest in Giventer's finances and investments at issue, Giventer already has committed fraud and likely will commit fraud in the future, and absent an agent to oversee Agro, there is nothing to stop Giventer from moving assets out of those companies to another hiding place.

WHEREFORE State Farm respectfully requests that the Court enter an Order:

(A)     Issuing a Temporary Restraining Order restraining Agro, as well as the officers, agents, and servants of Agro, from the actions set forth herein;

(B)     Appointing a Receiver with the rights, powers, and duties set forth herein; or

(C)     In the alternative, appointing a Special Fiscal Agent to investigate and report on the business operations and financial transactions and status of Agro; and

(D)     Granting all such further relief as the Court deems appropriate.

Dated: March 15, 2010                          Respectfully submitted,


      /s/   Neal Levin          
Neal H. Levin
Illinois Bar No. 6203156
*Attorney in Charge*
Daniel S. Dooley
Illinois Bar No. 6274831
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone: (312) 360-6000
Facsimile: (312) 360-6573

*Attorneys for State Farm Mutual Automobile Insurance Company and State Farm Mutual Insurance Company of Texas*